UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ARMANDO COLON,

                             Plaintiff,                   9:98-CV-1302
                                                 (FJS/GHL)

v.

GLENN S. GOORD, Commissioner of New York
State Department of Corrections, *et. al.*

                             Defendants.

_____

APPEARANCES:                            OF COUNSEL:

OFFICE OF STEPHEN LANCE CIMINO      STEPHEN LANCE CIMINO, ESQ.
  Counsel for Plaintiff
307 South Clinton Street, Suite 300
Syracuse, NY 13202-1250

HON. ANDREW M. CUOMO              SENTA B. SIUTA, ESQ.
Attorney General for the State of New York    Assistant Attorney General
  Counsel for Defendants
120 Broadway
New York, NY 10271

GEORGE H. LOWE, UNITED STATES MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

     This prisoner civil rights action has been referred to me for a Report-Recommendation by

the Honorable Frederick J. Scullin, Jr., Senior United States District Judge, following the

issuance of a Summary Order by the Second Circuit remanding the action to this Court to

conduct a hearing to determine Plaintiff's entitlement to equitable tolling of the applicable

limitations period.  Having conducted that hearing and carefully reviewed the parties' evidence

and arguments on the issue of equitable tolling, I find that Plaintiff is not entitled to equitable

tolling of the applicable limitations period, and I therefore recommend that the remainder of

Plaintiff's claims in his Amended Complaint (i.e., his claims against Defendants Kenneth Collyer

and Jane Parham arising from his wrongful placement in administrative segregation from May 8,

1995, to July 12, 1995) be dismissed as barred by the applicable statute of limitations.

## I.    RELEVANT BACKGROUND

On July 30, 1998, Plaintiff filed his original Complaint in this *pro se* prisoner civil rights

action, brought pursuant to 42 U.S.C. § 1983.  (*Compare* Dkt. No. 1, at 28-29 [Plf.'s Compl.,

dated 7/28/98] *with* Plf.'s Hearing Testimony [admitting that he did not receive back from the

prison law library the copies of certain documents he filed with his complaint until 7/30/98].)[1]

On November 22, 1999, he filed an Amended Complaint.  (Dkt. No. 38.)  Generally, in his

Amended Complaint, Plaintiff alleges that (1) Defendants Kenneth Collyer and Jane Parham

violated his constitutional rights when they wrongfully caused him to be subjected to

administrative segregation at Great Meadow Correctional Facility ("Great Meadow C.F.") from

---

[1]         Under the "prison mailbox rule," the date that a complaint is *signed* is the date
that the prisoner is *presumed* to have handed that complaint to a prison guard for mailing, which
is the constructive date of *filing* of the complaint with the court.  *See Shaw v. Superint., Attica
Corr. Facility*, 03-CV-0610, 2007 WL 951459, at *3 n.3 (N.D.N.Y. March 28, 2007) (McCurn,
J.) (habeas corpus proceeding) [citations omitted]; *Garraway v. Broome County, N.Y.*, 03-CV-
0681, 2006 WL 931729, at *3-4 (N.D.N.Y. Apr. 7, 2006) (McAvoy, J.) (prisoner civil rights
action) [citation omitted].  Here, I find that the presumption of mailing on July 28, 1998, is
sufficiently rebutted by the evidence that Plaintiff was not in possession of all of the papers that
he mailed to the Court until July *30*, 1998.  (Plf.'s Hearing Testimony; Hearing Ex. D-3.)  I note
that a credible argument exists that Plaintiff was not in possession of all of the papers that he
mailed to the Court until August 6, 1998.  Specifically, on July 31, 1998, he requested that seven
pages (relating to an unidentified action) be typed by August 6, 1998.  (Plf.'s Hearing Testimony;
Hearing Ex. D-3.)  He received those eight typed pages from the law library on August 6, 1998.
(*Id.*; *see also* Lonczak Affid., Ex. A, at 510 [noting that Plaintiff had some sort of contact with
the law library officer regarding "typing" on August 6, 1998.)  However, because the July 30,
1998, date inures to Plaintiff's benefit more than does any of the earlier dates, I will use that date
for purposes of this Report-Recommendation.

2

May 5, 1995, to July 12, 1995, for attempting to escape from prison, (2) Defendants Richard

Doling and Carol Chapman violated his constitutional rights when they wrongfully confined him

to Great Meadow C.F. Special Housing Unit ("SHU") starting on November 2, 1995, and

continuing for a period of five years, for conspiring to escape from prison, and (3) Defendants

Glenn Goord, Donald Selsky and James Stinson violated his constitutional rights when they

contributed to the aforementioned violations as supervisors.  (*Id.*).

On September 25, 2001, the Court granted Defendants' motion to dismiss for failure to

state a claim and, in the alternative, motion for summary judgment.  (Dkt. No. 70.)  On October

5, 2001, Plaintiff appealed through appointed counsel.  (Dkt. No. 72.)  The issues on appeal

focused on (1) whether this Court should have granted summary judgment to Defendants Collyer

and Parham on the ground that Plaintiff failed to demonstrate sufficient facts in dispute material

to whether he suffered a hardship sufficient to infringe on a liberty interest under *Sandlin v.*

*Conner*, 515 U.S. 472, 484 (1995), and (2) whether Plaintiff's claims against Defendants Collyer

and Parham are, in any event, barred by the three-year statute of limitations governing claims

brought pursuant to 42 U.S.C. § 1983 in federal district courts sitting in New York State.  (Dkt.

Nos. 70, 74, 119.)  On October 20, 2004, the Second Circuit vacated this Court's judgment with

regard to Defendants Collyer and Parham and remanded the action "for a hearing to determine

whether [Plaintiff] filed timely, taking into consideration any [equitable] toll[ing] to which he

proves entitlement."  (Dkt. Nos. 74, 77.)  In so doing, the Second Circuit stated that, "while [it]

has never held solitary confinement alone sufficient to entitle a prisoner to equitable tolling,

prison conditions that *prevent* a prisoner from timely filing may require equitable tolling," citing

*Hizbullahankhamon v. Walker*, 255 F.3d 65, 75 (2d Cir. 2001).  (Dkt. No. 77, at 3 [emphasis in

original].)

On May 22, 2006, this Court held the evidentiary hearing mandated by the Second

Circuit.  (*See* Minute Entry for 5/22/06.)  At the hearing, Plaintiff testified for himself, and

Correctional Sergeant Bernard Lonczak (who oversaw the Great Meadow C.F. law library from

February 23, 1998, to September 11, 2002) testified for Defendants.  (*Id.*)  At the conclusion of

the hearing, the Court requested that the parties submit post-hearing memoranda and evidence.

(*Id.*)  On July 14, 2006, the parties completed their filing of those submissions.  (Dkt. Nos. 117-

119.)

## II.   SUMMARY OF FACTS ESTABLISHED AT HEARING

The following is a general summary of the facts established by the parties through their

submission of testimony and documents at the hearing conducted on May 22, 2006 (and through

their filing of post-hearing memoranda and documents).

### A.   History of Plaintiff's Confinement to Administrative Segregation

On May 5, 1995, Plaintiff was subjected to "keeplock confinement" to his cell at Great

Meadow C.F., for allegedly attempting to escape from prison.[2]  Pursuant to a further exercise of

administrative segregation, on May 8, 1995, Plaintiff was transferred from his cell to Great

Meadow C.F.'s SHU.[3]  Upon arriving at the Great Meadow C.F. SHU, Plaintiff was served with

a copy of the Administrative Segregation Recommendation, which informed him that the

_____

[2]      (Plf.'s Hearing Testimony; *see also* Dkt. No. 38, ¶ 13 [Plf.'s Verified Am.
Compl.].)

[3]      (Plf.'s Hearing Testimony.)

segregation was based on "confidential information" from "two separate sources."[4]
Plaintiff's administrative segregation hearing was conducted between May 19 and May 31,
1995.[5]  At the hearing, Plaintiff was informed in somewhat more detail of the nature of the
confidential information upon which he had been placed in administrative segregation.[6]  At the
conclusion of the hearing, Plaintiff was sentenced to an indefinite period of administrative
segregation confinement.[7]  In addition, Plaintiff was given a written copy of the Hearing
Determination, which stated that the evidence relied upon in reaching the determination included
"two separate sources of confidential information."[8]  On June 26, 1995, Plaintiff wrote a letter to
First Deputy Superintendent John J. Maloy, in part asserting that the two confidential informants
in question were unreliable and motivated by a "fear or dislike" of Plaintiff.[9]  On July 12, 1995,
First Deputy Superintendent Maloy concluded, in an "interdepartmental memorandum," that the
confidential information upon which the allegation was based was of a "dubious" nature, and he
ordered the immediate release of Plaintiff from administrative segregation.[10]  That same day,

---

[4]     (*Id.*; *see also* Dkt. No. 38, ¶ 14 & Ex. 1 [Plf.'s Verified Am. Compl.].)

[5]     (Plf.'s Hearing Testimony; Dkt. No. 38, ¶¶ 15-18 & Exs. 1A-4 [Plf.'s Verified Am. Compl.].)

[6]     (*Id.*)

[7]     (Dkt. No. 38, ¶ 18 & Ex. 4 [Plf.'s Verified Compl.].)

[8]     (*Id.*)

[9]     (Dkt. No. 38, ¶ 19 & Ex. 5 [Plf.'s Verified Compl.].)

[10]    (Plf.'s Hearing Testimony; *see also* Dkt. No. 38, ¶ 20 & Ex. 6 [Plf.'s Verified Am. Compl.].)

Plaintiff was released from administrative segregation.[11]  On or about that date, Plaintiff learned

the reason for his release first-hand from First Deputy Superintendent Maloy.[12]  Two days later,

on July 14, 1995, Plaintiff's assignment to administrative segregation was *affirmed* by letter from

the Acting Director of DOCS' Special Housing/Inmate Discipline Program, who stated, in

pertinent part, "A review of available records indicates that the hearing which resulted in [your]

assignment [to Administrative Segregation status at Great Meadow C.F.] was conducted in

accordance with established procedures.  It is noted that you are no longer assigned to

Administrative Segregation."[13]

Later that fall, on November 2, 1995, Plaintiff was again confined to the Great Meadow

C.F. SHU for allegedly conspiring to escape from prison.[14]  Plaintiff was convicted of that

disciplinary charge and sentenced to confinement in SHU for a period of five years.[15]  He served

that SHU confinement at Great Meadow C.F. until December of 1995, when he was transferred

to Green Haven C.F., where he served the remainder of his SHU confinement until 2000.[16]

---

[11]     (Plf.'s Hearing Testimony; *see also* Dkt. No. 38, ¶ 20 & Ex. 7 [Plf.'s Verified Am.
Compl.].)

[12]     (Plf.'s Hearing Testimony; *see also* Dkt. No. 38, ¶ 20 [Plf.'s Verified Am.
Compl.].)

[13]     (Dkt. No. 38, ¶ 21 & Ex. 7 [Plf.'s Verified Am. Compl.].)

[14]     (Plf.'s Hearing Testimony; *see also* Dkt. No. 38, ¶ 22 & Ex. 8, 14 [Plf.'s Verified
Am. Compl.].)

[15]     (Plf.'s Hearing Testimony; *see also* Dkt. No. 38, ¶ 35 & Ex. 14 [Plf.'s Verified
Am. Compl.].)

[16]     (Plf.'s Hearing Testimony.)

**B.      Delay of Typing Services at Green Haven C.F.**

In January of 1998, Plaintiff knew that the limitations period governing prisoner civil rights actions brought pursuant to 42 U.S.C. § 1983 in New York State was three years (although he was uncertain of whether the date from which the three-year period ran was the date on which he was first placed in administrative segregation, i.e., May 5, 1995, or the date on which his administrative segregation placement was affirmed on appeal, i.e., July 14, 1995, or any date in between those two dates).[17]  He also knew that he could have filed a handwritten Complaint with the district court.[18]  He also knew that, after filing a handwritten Complaint, he could file an Amended Complaint that was, *inter alia*, typewritten.[19]  However, he wanted his original Complaint in this action to be "neat" and "as professional as possible."[20]

At some point in "the latter part of January" of 1998 (while Plaintiff was still confined in the Green Haven C.F. SHU), he submitted a handwritten draft of his original Complaint in this action to the law library officer assigned to SHU so that it could be typed.[21]  "About a month

---

[17]      (*Id.*)

[18]      (*Id.*)

[19]      (*Id.*)

[20]      (*Id.*)

[21]      (*Id.*)  The Law Library Log Book contained in Exhibit A to Sergeant Lonczak's affidavit indicates that Plaintiff made some sort of request (or perhaps an inquiry into the status of a prior request) regarding "typing" on the following dates in January of 1995: January 12, January 23, January 28, January 30, February 3, February 12, February 13, February 17, February 20, and February 24, 1998.  (Lonczak Affid., Ex. A, at 304, 314, 318, 320.)

later," in February of 1998, Plaintiff "inquired about [his] legal papers."[22]  At that time, he was

informed by the assigned law library officer that he "was on a waiting list and that [he] just had

to be patient."[23]  "About a month later," in March of 1998 (presumably on March 17, 1998),

Plaintiff was informed by the law library officer that his handwritten Complaint had not been

typed because the inmate law clerk assigned to type it had deemed it "not legible."[24]  At the time,

Plaintiff expressed frustration, remarking, "It's legible to me and to everyone else."[25]  During the

following four or five days, Plaintiff re-wrote the Complaint, trying to handwrite it more neatly,

and then resubmitted his rewritten Complaint to the law library for typing.[26]

     During the following months, he made repeated requests about the status of his typed

Complaint, and was repeatedly told by the assigned law library officer that he "just had to be

---

[22]    (Plf.'s Hearing Testimony.)  The Law Library Log Book contained in Exhibit A to Sergeant Lonczak's affidavit indicates that Plaintiff made some sort of request (or perhaps an inquiry into the status of a prior request) regarding "typing" on the following dates in February of 1995: February 3, February 12, February 13, February 17, February 20, and February 24, 1998. (Lonczak Affid., Ex. A, at 323, 330-31, 334, 336, 339.)

[23]    (Plf.'s Hearing Testimony.)

[24]    (*Id.*; Lonczak Affid., Ex. A, at 359 [noting that some sort of "typing" was "returned" to Plaintiff on March 17, 1998].)  It bears noting that the Law Library Log Book contained in Exhibit A to Sergeant Lonczak's affidavit also indicates that, on February 26, 1998, some sort of "typing" was "returned" to Plaintiff from the Green Haven C.F. law library. (Lonczak Affid., Ex. A, at 341.)

[25]    (Plf.'s Hearing Testimony.)

[26]    (*Id.*)  While the Law Library Log Book contained in Exhibit A to Sergeant Lonczak's affidavit does not indicate that Plaintiff submitted any typing requests or inquiries during the month or so following March 17, 1998, the Log Book does indicate that Plaintiff made a typing request or inquiry on April 29, 1998.  (Lonczak Affid., Ex. A, at 409.)

patient."[27]  In addition, Plaintiff was given a variety of reasons for the delay in having his

Complaint typed.[28]  Specifically, Plaintiff was also told, in April of 1998, that the inmate law

clerk who had been typing Plaintiff's Complaint had been transferred to another correctional

facility.[29]  He was further told that the delay was caused by the fact that (1) due to the enactment

of the Antiterrorism and Effective Death Penalty Act in 1996, there were many typing requests

being submitted by the two thousand inmates at Green Haven C.F., and (2) it was the policy of

the law library typists that typing papers in criminal matters "took precedence over" typing

papers in civil matters."[30]  In addition, during a one-week period in May of 1998 (i.e., May 16

through May 22, 1998), the entire Facility was in "lock down" (following the stabbing of the

Deputy Commissioner of Security at Green Haven C.F.), and therefore all regular inmate

activity–including requests for, and receipt of, law library services such as typing–was ceased.[31]

Finally, at some point in June of 1998 (presumably on June 4, 1998), Plaintiff's typed Complaint

---

[27]     (Plf.'s Hearing Testimony; *see also* Lonczak Affid., Ex. A, at 419, 422, 437, 477 [noting that Plaintiff made some sort of request or inquiry regarding "typing" on the following dates: May 11, May 13, June 4, and July 7, 1998].)

[28]     (Plf.'s Hearing Testimony.)

[29]     (*Id*.)

[30]     (*Id*.)  It bears noting that Sergeant Lonczak testified that, during the time in question, there was no such policy at the Green Haven C.F. Law Library to give criminal matters priority over civil matters.  (Lonczak Hearing Testimony.)

[31]     (Plf.'s Hearing Testimony; Lonczak Affid., Ex. A, at 410-32 [reflecting inmate requests, and receipt, of law library resources on every day in May of 1998 except from May 16 through May 22, 1998, because law library was "closed" during that time period "due to facility shut down"]; Hearing Ex. D-4 [attaching Green Haven C.F. Law Library Copy Machine Log Book for period of January to July of 1998, reflecting that Green Haven C.F. was "shut down" from May 16 through May 22, 1998].)

was completed.[32]  Plaintiff's typed Complaint was (when finished) thirty pages in length.[33]

Subsequently, on or about July 24, 1998, Plaintiff asked the law library officer assigned to SHU, about the typing of "the other forms that are supposed to go with the Complaint," such as the summonses and *in forma pauperis* application.[34]  On July 28, 1998, Plaintiff submitted a request that ten pages (consisting of eight summonses and two "court forms") be typed "immediate[ly]."[35]  Plaintiff received those ten typed pages from the law library the next day, on July 29, 1998.[36]  On July 30, 1998, he requested that eight pages (relating to this action) be typed "immediate[ly]."[37]  He received those eight typed pages from the law library that same day.[38]

During the relevant time period at Green Haven C.F., typing services for inmates (as well

---

[32]     (Plf.'s Hearing Testimony.)  According to the Law Library Log Book contained in Exhibit A to Sergeant Lonczak's affidavit, the only date in June of 1998 on which there occurred any contact between Plaintiff and the law library regarding "typing" was June 4, 1998.  (Lonczak Affid., Ex. A, at 437.)

[33]     (Dkt. No. 1, at 1-30 [Plf.'s Compl.].)

[34]     (Plf.'s Hearing Testimony; *see also* Lonczak Affid., Ex. A, at 496 [noting that Plaintiff made some sort of request or inquiry regarding "typing" on July 24, 1998].)

[35]     (Plf.'s Hearing Testimony.)  The Green Haven C.F. Law Library Typing Log from July through November of 1998 indicates that, on July 28, 1998, Plaintiff submitted a request that ten pages of handwritten documents be typed on a rush basis, and that those ten typed pages were returned to Plaintiff on July 29, 1998.  (Hearing Ex. D-3.)

[36]     (Hearing Ex. D-3; *see also* Dkt. Nos. 1-3, 6-12 [each typed and dated 7/28/98].)

[37]     (Plf.'s Hearing Testimony.)  The Green Haven C.F. Law Library Typing Log from July through November of 1998 indicates that, on July 30, 1998, Plaintiff submitted a request that eight pages of handwritten documents be typed on a rush basis, and that those eight typed pages were returned to Plaintiff on July 30, 1998.  (Hearing Ex. D-3; *see also* Lonczak Affid., Ex. A, at 502 [noting that Plaintiff made some sort of request or inquiry regarding "typing" on July 30, 1998].)

[38]     (Plf.'s Hearing Testimony; Hearing Ex. D-3.)

as copying and research services for inmates) were performed by certified inmate law clerks.[39]

During the relevant time period, the Green Haven C.F. law library employed between twenty and

twenty-three certified inmate law clerks, approximately two to three of whom were assigned (at

any given time) the job of providing typing services to inmates through use of their own

typewriters.[40]  In addition, Green Haven C.F. housed approximately two thousand inmates, many

of whom requested services (including typing services) from the law library.[41]

     **C.**     **Delay of Copying Services at Green Haven C.F.**

     At various undetermined times during the six-month period of late-January 1998 through

July 30, 1998, at Green Haven C.F., Plaintiff requested that the law library copy certain of the

twenty pages of exhibits that he ultimately attached to his Complaint.[42]  Plaintiff "chose" to

---

[39]     (Plf.'s Hearing Testimony; Lonczak Hearing Testimony; Hearing Ex. D-8 [attaching copy of Green Haven C.F. Law Library Policy & Procedure Statement].)

[40]     (Lonczak Hearing Testimony.)

[41]     (Plf.'s Hearing Testimony; Lonczak Hearing Testimony; *see also generally* Lonczak Affid., Ex. A, at 294-500 [reflecting numerous requests by other inmates for "typing" services to be performed by inmate law clerks at Green Haven C.F. during the relevant time period].)

[42]     (Plf.'s Hearing Testimony; *see also* Dkt. No. 1, at 31-51).  While the Law Library Log Book contained in Exhibit A to Sergeant Lonczak's affidavit does not indicate what papers Plaintiff sought to have copied, or when those copies were returned to Plaintiff, it does indicate that Plaintiff submitted requests or inquiries regarding copies, and/or received completed copies, on the following dates: January 7, January 8, January 12, January 21-22, February 2, February 4, February11-12, February 17, February 19, February 20, February 23-25, March 5-6, March 10, March 19-20, April 30, May 5, May 12, and June 9, 1998.  (Lonczak Affid., Ex. A, at 300-01, 304, 312-13, 322, 324, 329-30, 334-36, 338-40, 347-48, 351, 363, 365, 410, 414, 421, 442.)  It bears noting that, while Plaintiff was, in the spring or summer of 1998, awaiting receipt of various of the documents comprising his Complaint's exhibits pursuant to a Freedom of Information Law request, he had been in possession of various other of those documents (e.g., Exhibits 1, 4 and 7) since 1995.  (Plf.'s Hearing Testimony; Hearing Ex. D-6.)

attach these exhibits to his Complaint because he wanted to "strengthen" his Complaint.[43]

In addition, after Plaintiff's Complaint was typed and returned to him in June of 1998, he handed it back to the law library officer assigned to SHU (presumably on June 9, 1998) and requested that eight photocopies of it be made.[44]

However, Plaintiff experienced various delays in receiving these photocopies.[45]  Most notably, as stated above, during a one-week period in May of 1998 (i.e., May 16 through May 22, 1998), the entire Facility was in "lock down," and therefore all regular inmate activity–including requests for, and receipt of, law library services such as copying–was ceased.[46]  Moreover, during one day in June of 1998 (i.e., June 25, 1998), and seventeen days in July of 1998 (i.e., from July 6 to 23, 1998), the Green Haven C.F. Law Library copy machine was not operational.[47]  As a result, he did not have all of the photocopies he had requested until "sometime in July" of 1998.[48]

---

[43]      (Plf.'s Hearing Testimony.)

[44]      (*Id*.)  The Law Library Log Book contained in Exhibit A to Sergeant Lonczak's affidavit indicates the only date in June of 1998 on which there occurred any contact between Plaintiff and the law library regarding "copies" was June 9, 1998.  (Lonczak Affid., Ex. A, at 442.)

[45]      (Plf.'s Hearing Testimony.)

[46]      (*Id*.; Lonczak Affid., Ex. A, at 410-32 [reflecting inmate requests, and receipt, of law library resources on every day in May of 1998 except from May 16 through May 22, 1998, because law library was "closed" during that time period "due to facility shut down"]; Hearing Ex. D-4 [attaching Green Haven C.F. Law Library Copy Machine Log Book for period of January to July of 1998, reflecting that Green Haven C.F. was "shut down" from May 16 through May 22, 1998].)

[47]      (Plf.'s Hearing Testimony; *see generally* Hearing Ex. D-4 [attaching Green Haven C.F. Law Library Copy Machine Log Book for period of January to July of 1998].)

[48]      (Plf.'s Hearing Testimony.)

In cases in which the Green Haven C.F. Law Library copy machine was not operational, there was an "emergency copy procedure" in place.[49]  Pursuant to that emergency copy procedure, if an inmate (even if in SHU) "show[s] in writing to the law library supervisor that he has to send [the copies] to the courts by a specific date[,]" then the copies will be made on an expedited (forty-eight hour) basis through use of another copy machine at the Facility.[50]  This emergency copy procedure was available, and used, during the periods of time in May and July of 1998 when the law library copy machine was inoperable.[51]  However, Plaintiff did not use this emergency copy procedure during those time periods.[52]

Plaintiff did not use the emergency copy procedure because he did not know of that procedure.[53]  During the relevant time period, the emergency copy procedure was published in the Green Haven C.F. Law Library Policy and Procedure Manual, which was available to all inmates in the Green Haven C.F. Law Library and the Green Haven C.F. SHU "mini-law library."[54]  In addition, during the relevant time period, there was an assigned law library officer

---

[49]     (Lonczak's Hearing Testimony; Hearing Ex. D-8 [attaching copy of Green Haven C.F. Law Library Policy & Procedure Statement, Part V.J.10. of which regards the "emergency copy procedure" to take effect whenever the law library copy machine is "not operational"].)

[50]     (Hearing Ex. D-8.)

[51]     (Lonczak's Hearing Testimony.)

[52]     (Plf.'s Hearing Testimony; *see also* Lonczak Affid., Ex. A, at 410-32, 469-99 [reflecting inmate requests, and receipt, of law library resources for May and July of 1998, but not reflecting any "emergency" requests made by Plaintiff during those time periods].)

[53]     (Plf.'s Hearing Testimony.)

[54]     (Lonczak's Hearing Testimony; *see also* Hearing Ex. D-8 [attaching copy of Green Haven C.F. Law Library Policy & Procedure Statement].)

who visited the Green Haven C.F. SHU once or twice per day (except on holidays), collecting requests for law library services from SHU inmates, and delivering completed projects to those inmates.[55]  During these daily visits, the assigned law library officer was also available to answer any questions the inmates might have about the process or about availability of law library resources, including the copying service.[56]  Finally, during the time in question, inmates could make unlimited copies of handwritten documents by use of carbon paper, which they could request from either their Housing Unit Officer or the law library.[57]

Plaintiff signed and dated his original verified Complaint in this action on July 28, 1998.[58]

## III.   DISCUSSION

### A.   Legal Standard Governing Equitable Tolling of Limitations Period

"The applicable statute of limitations for § 1983 actions arising in New York requires claims to be brought within three years."  *Pinaud v. County of Suffolk*, 52 F.3d 1138, 1156 (2d Cir. 1995) [citations omitted]; *see also Connolly v. McCall*, 254 F.3d 36, 40-41 (2d Cir. 2001) ("[Plaintiff's] federal constitutional claims, brought pursuant to 42 U.S.C. § 1983, are governed

---

[55]      (Lonczak's Hearing Testimony; Plf.'s Hearing Testimony; *see also* Lonczak Affid., Ex. A, at 294-500 [reflecting visits made by law library officers to inmates in SHU generally twice per day during the period of January of 1998 through July of 1998]; Hearing Ex. D-8 [attaching copy of Green Haven C.F. Law Library Policy & Procedure Statement, Part V.F. of which references daily visits made by law library officers to inmates in SHU].)

[56]      (Lonczak's Hearing Testimony; *see also* Plf.'s Hearing Testimony [acknowledging that law library officer assigned to SHU was available to talk to inmates about the law library services].)

[57]      (Lonczak's Hearing Testimony.)

[58]      (Plf.'s Hearing Testimony; Dkt. No. 1, at 28-30 [Plf.'s Verified Compl.].)

by New York's three-year statute of limitations for personal injury actions . . . .") [citations omitted].  A claim arising under Section 1983 accrues "when the plaintiff knows or has reason to know of the harm that he seeks to redress."  *Connolly v. McCall*, 254 F.3d 36, 41 (2d Cir. 2001) [internal quotation marks and citation omitted], *accord*, *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002) [internal quotation marks and citations omitted].

Here, I find Plaintiff "knew or had reason to know of the harm that he seeks to redress" against Defendants Collyer and Parham (i.e., that they had intentionally or recklessly caused him to be wrongfully placed in administrative segregation based on confidential information that was patently unreliable) at the very latest on July 12, 1995, when First Deputy Superintendent Maloy released Plaintiff from administrative segregation because the confidential information upon which the administrative segregation was based was of a "dubious" nature.[59]  I further find that, *absent the equitable tolling of the three-year limitations period*, the three-year limitations period had expired on July 12, 1998, more than two weeks before Plaintiff mailed (and thus constructively "filed") the original Complaint in this action, on July 30, 1998.

Of course, in certain circumstances, a statute of limitations may be equitably tolled.  To

---

[59]     (*See also* Plf.'s Appellate Reply Brief, at 20 [2d Cir., filed Aug. 2, 2004].)  I note that a credible argument exists that Plaintiff "knew or had reason to know of the harm that he sought to redress" (1) on or about July 5, 1995, when he received a memorandum from First Deputy Superintendent informing him that the confidential sources on which his administrative segregation was based "may be questionable," or (2) between May 19 and May 31, 1995, when he attended his administrative segregation hearing, at which these two confidential sources were discussed, or (3) on May 8, 1995, when he was placed in SHU and served with his Administrative Segregation Recommendation, which stated that the segregation was based on "confidential information" from "two separate sources."  (Plf.'s Hearing Testimony; Dkt. No. 38, ¶¶ 13-31 & Exs. 1-5 [Plf.'s Verified Am. Compl.].)  However, because the July 12, 1995, date inures to Plaintiff's benefit more than does any of the earlier dates, I will use that date for purposes of this Report-Recommendation.

equitably toll the one-year limitations period, a plaintiff

> must show that extraordinary circumstances prevented him from filing his [complaint] on time, and he must have acted with reasonable diligence throughout the period he seeks to toll. . . .  To show that extraordinary circumstances 'prevented' him from filing his [complaint] on time, [the plaintiff] must demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the [plaintiff], acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances.

*Hizbullahankhamon v. Walker*, 255 F.3d 65, 75 (2d Cir. 2001) [internal quotation marks and citation omitted].  "While [the Second Circuit] has never held solitary confinement alone sufficient to entitle a prisoner to equitable tolling, prison conditions that *prevent* a prisoner from time filing may require equitable tolling."  *Colon v. Goord*, No. 01-0258, Summary Order, at 3 (2d Cir. filed Oct. 20, 2004) [emphasis in original].[60]  Finally, it bears noting that, while the statute of limitations is an affirmative defense regarding which a defendant bears the burden of proof,[61] when a plaintiff argues that such a statute of limitations should be equitably tolled, the plaintiff bears the burden of proof on that issue.[62]

---

[60]     Consistent with § 0.23(c)(2) of the Rules of the U.S. Court of Appeals for the Second Circuit, this Summary Order is cited merely to call this portion of the Summary Order to the attention of the Court during what is now "a subsequent stage of [the] case in which the summary order has been entered."

[61]     *Overall v. Estate of Klotz*, 52 F.3d 398, 403 (2d Cir. 1995); *Rosario v. Bennett*, 01-CV-7142, 2002 U.S. Dist. LEXIS 24495, at *38 & n.14 (S.D.N.Y. Dec. 20, 2002) [citing cases], *adopted by* 2003 U.S. Dist. LEXIS 758 (S.D.N.Y. Jan. 21, 2003).

[62]     *Chapman v. Choicecare Long Is. Term Disab. Plan*, No. 01-7282, 2002 U.S. App. LEXIS 24460, at *14 (2d Cir. 2002) ("[T]he burden of providing that [equitable] tolling is appropriate rests on the plaintiff."); *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000) ("The burden of demonstrating the appropriateness of equitable tolling . . . lies with the plaintiff."); *cf. Smaldone v. Sendowski*, 273 F.3d 133, 138 (2d Cir. 2001) ("To merit application of equitable tolling, the petitioner must demonstrate that he acted with 'reasonable diligence' during the period

**B.      Application of Legal Standard to Facts of Current Case**

**1.      Delay of Typing Services**

Under the circumstances, I find that the delay that occurred in the typing of Plaintiff's

Complaint, exhibits and other papers–which occurred for reasons such as the initial illegibility of

Plaintiff's handwriting, the transfer of an inmate typist (assigned to Plaintiff's project) to another

facility, the occurrence of a "lock down" for one week in May of 1998, the thirty-page length of

the Complaint, and the ratio of inmate law clerks to prisoners requesting typing services at Green

Haven C.F.–did not constitute an *extraordinary circumstance* for purposes of the Second

Circuit's equitable-tolling analysis.[63]   Indeed, the delay in question would appear to have been

---

he wishes to have tolled . . . .").  Plaintiff's counsel acknowledged this point of law during the
oral-argument portion of the hearing.  (*See* Recording of Hearing held on May 22, 2006.)

[63]      *See Belot v. Burge*, 03-CV-1478, 2005 U.S. Dist. LEXIS 45386, at *19 (S.D.N.Y.
July 14, 2005) ("Courts have found that solitary confinement, lock-downs, and restricted access
to the law library do not qualify as 'extraordinary circumstances' warranting equitable tolling.")
[collecting cases], *adopted*, 2005 U.S. Dist. LEXIS 45385 (S.D.N.Y. Sept. 19, 2005), *aff'd on
other grounds*, 490 F.3d 201, 208 (2d Cir. 2007), *cert. denied*, 128 S. Ct. 1224 (2008); *Hardy v.
Conway*, 299 F. Supp.2d 159, 161 (E.D.N.Y. 2004) ("[T]ransfers between prison facilities,
solitary confinement, lock-downs, restricted access to the law library and an inability to secure
court documents do not qualify as extraordinary circumstances.") [citations omitted], *vacated on
other grounds*, No. 04-0934, 162 Fed. App'x 61 (2d Cir. Jan. 12 2006); *Amante v. Walker*, 268 F.
Supp.2d 154, 158 (E.D.N.Y. 2003) ("Generally, transfers between prison facilities, solitary
confinement, lockdowns, restricted access to the law library, and an inability to secure court
documents do not by themselves qualify as extraordinary circumstances."); *Lindo v. Lefever*, 193
F. Supp.2d 659, 663 (E.D.N.Y. 2002) ("Transfers between prison facilities, solitary confinement,
lockdowns, restricted access to the law library and an inability to secure court documents do not
qualify as extraordinary circumstances."); *see also Williams v. Miller*, 07-CV-0467, 2007 U.S.
Dist. LEXIS 73785, at *12 (W.D. Okla. June 11, 2007) ("Petitioner contends that the limitations
period should be equitably tolled because . . . he was hindered in preparing timely pro se post-
conviction filings by inadequate access to the prison law library, his own inadequate typing
skills, and 'numerous occasions' of indefinite prison lockdowns. . . .  However, none of these
circumstances excuse Petitioner from the obligation to diligently pursue his claims . . . .")
[citations omitted], *adopted,* 2007 U.S. Dist. LEXIS 64856, at *3-4 (W.D. Okla. Aug. 31, 2007),
*appeal dismissed*, No. 07-6228, 2008 U.S. App. LEXIS 2984, at *4-5 (10th Cir. Feb. 8, 2008).

rather *routine* in a maximum-security correctional facility such as Green Haven C.F.[64]

Even if the delay in typing services provided by the Green Haven C.F. Law Library was somehow an *extraordinary* occurrence, that delay did not *prevent* Plaintiff from timely filing his Complaint. As explained above in Part II.B. of this Report-Recommendation, the parties have adduced sufficient evidence for me to find that a handwritten draft of Plaintiff's original Complaint in this action existed in January of 1998. At the time, the Local Rules of Practice for this Court expressly permitted the filing of handwritten complaints. N.D.N.Y. L.R. 10.1(a) (requiring that pleadings "presented for filing" merely be, in pertinent part, "plainly and legibly written, typewritten, printed or reproduced"). Furthermore, as also explained above in Part II.B. of this Report-Recommendation, Plaintiff knew this fact at the time. In addition, no evidence has been presented to the Court showing that he was not, at the time, capable of writing legibly;[65] he was certainly capable of that activity in the following months and years.[66] In short, I find that

---

[64] *See Belot*, 2005 U.S. Dist. LEXIS 45386, at *19 (characterizing "solitary confinement, lock-downs, and restricted access to the law library" as some of the "*routine* restrictions of prison life") [emphasis added; citation omitted], *accord, Atkins v. Harris*, 98-CV-3188, 1999 U.S. Dist. LEXIS 164, at *6 (N.D. Cal. Jan. 7, 1999); *Posada v. Schomig*, 64 F. Supp. 2d 790, 796 (C.D. Ill. 1999) (characterizing petitioner's allegations that, *inter alia*, prison was sometimes on lock-down and that prison law clerk did not provide adequate assistance, as "*run-of-the-mill* claims" that do not establish "extraordinary circumstances" justifying equitable tolling) [emphasis added; citations omitted].

[65] To the contrary, at the hearing, Plaintiff testified that, while the initial draft of his handwritten Complaint was deemed to be illegible by someone in the law library, Plaintiff subsequently (apparently in March and/or April of 1998) rewrote that Complaint in a sufficiently legible fashion for it to be read and typed by someone in the law library. Indeed, he testified that, when he learned (in March of 1998) that the initial draft of his handwritten Complaint had been deemed to be illegible by someone in the law library, Plaintiff remarked, "It's legible to me and to everyone else."

[66] (*See, e.g.*, Dkt. No. 18 [Plf.'s Letter to Court dated 12/25/98]; Dkt. No. 23 [Plf.'s Letter to Court dated 3/8/99]; Dkt. No. 27 [Plf.'s Letter to Court dated 4/12/99]; Dkt. No. 35

nothing (including the asserted delay in typing services) prevented him from filing his original

Complaint in this action in January of 1998.[67]

For each of these alternative reasons, I find that Plaintiff has failed to meet his burden of

proof in demonstrating that the three-year statute of limitations should be equitably tolled based

on the delay in typing services he experienced at the Green Haven C.F. Law Library during the

relevant time period.  Because adequate grounds exist upon which to base my finding (that the

three-year statute of limitations should not be equitably tolled based on the delay of typing

services at the Green Haven C.F. Law Library during the relevant time period), I need not, and

do not, reach the issue of whether Plaintiff failed to act with *reasonable diligence* in pursuing his

rights by waiting until January of 1998 (at least two-and-a-half years after the limitations period

started running) to submit his draft Complaint for typing.

### 2.      Delay of Copying Services

Under the circumstances, I find that the delay that occurred in the copying of Plaintiff's

Complaint and exhibits (e.g., resulting from the inoperability of the copy machine in the Green

---

[Plf.'s Letter to Court dated 10/8/99].)

[67]      *See Belot*, 490 F.3d at 204, 207-08 (affirming district court denial of application
for equitable tolling on the ground that petitioner could have filed an "unpolished" but timely
petition); *DeJesus v. U.S.*, 07-CV-0715, 2007 WL 2009792, at *2 (D. Conn. July 6, 2007)
(rejecting petitioner's equitable-tolling argument, in part because he "could have filed a basic
petition within the statute of limitations, and then amended it later when he had more access to
the law library") [citation omitted]; *Jones v. Cockrell*, 01-CV-2779, 2003 U.S. Dist. LEXIS 8728,
at *9 (N.D. Tex. May 22, 2003) (rejecting petitioner's equitable-tolling argument, in part because
petitioner's medical records did not support his contention that he could not write his petition by
longhand during the relevant period), *adopted*, 2003 U.S. Dist. LEXIS 22155, at *1-3 (N.D. Tex.
Dec. 9, 2003).  I also find that–to the extent that Plaintiff waited until *after* the July 12, 1998,
filing deadline to request the typing of various of his other papers filed with the Complaint–he
did not act with *reasonable diligence* in pursuing his rights.

Haven C.F. Law Library for certain periods of time in May and July of 1998) did not constitute an *extraordinary circumstance* for purposes of the Second Circuit's equitable-tolling analysis.[68]  I note that at least one federal district court has characterized the breaking down of a prison copy machine as a "frequent[]" occurrence.  *See Ruiz v. Herrea*, 99-CV-3572, 2000 U.S. Dist. LEXIS 13018, at *16-17 (N.D. Ill. Sept. 6, 2000) ("Unfortunately, photocopiers frequently jam and this is simply not the type of delay a prisoner may rely on in seeking equitable tolling.").

Even if the referenced inoperability of the Green Haven C.F. Law Library copy machine for certain periods of time in May and July of 1998 was somehow an *extraordinary* occurrence, that inoperability did not *prevent* Plaintiff from filing his Complaint in this action.  Plaintiff did not need copies of his Complaint, or copies of the exhibits attached to that Complaint, in order to file his original Complaint with the Clerk of this Court.[69]

Nor do I believe that Plaintiff even "needed" the exhibits in question in order to present the factual allegations material to the claims asserted in his Complaint: because the body of his

---

[68]    *See Vasquez v. Admin'r of N.J. N. State Prison*, 05-CV-5480, 2007 U.S. Dist. LEXIS 6531, at *12, 14, 20 (D. N.J. Jan. 30, 2007) (rejecting petitioner's argument that extraordinary circumstances prevented him from timely filing his petition by October 26, 2005, in that a local rule of practice for the federal district court required habeas corpus petitions to be filed in duplicate and the prison law library's copy machine was broken from, *inter alia*, October 24 to October 26, 2005); *see also Vasquez v. Admin'r of N.J. N. State Prison*, 05-CV-5480, Affidavit of Ronald Long, ¶¶ 4-6, and Affidavit of Israel Vasquez, ¶¶ 7-8 (D. N.J. filed Aug. 8, 2006) (indicating that the dates on which the law library's photocopier was not working were October 24-26, 2005).

[69]    *See* Fed. R. Civ. P. 5(e) ("The clerk shall not refuse to accept for filing any paper presented for [filing] solely because it is not presented in proper form as required by these rules or any local rules or practices.") [version of Rule in effect in 1998]; *Ruiz*, 2000 U.S. Dist. LEXIS 13018, at *15 (rejecting plaintiff's equitable-tolling argument that he needed to file duplicate copies of his complaint and the prison law library's photocopier was inoperable immediately before his complaint's filing deadline, because "the clerk of the court would have accepted the complaint for filing even though the requisite copies did not accompany it").

Complaint either adequately summarized or directly quoted from the relevant passages contained in the Exhibits to the Complaint, I find that the body of his Complaint did not need to attach (and incorporate by reference the statements contained in) the exhibits to the Complaint.  (*Compare* Dkt. No. 1, ¶¶ 13-14, 16-20, 24-51, 55, 57, 62, 69-70, 75, 85-86 [Plf.'s Compl.] *with* Dkt. No. 1, Exs. 1-18 [Plf.'s Compl.].)[70]

Furthermore, even assuming that copies of his Complaint and exhibits were necessary for Plaintiff to file his Complaint, I find that Plaintiff could have discovered, and availed himself of, the "emergency copy procedure" that was in place at Green Haven C.F. during the relevant time period.  Alternatively, he could have used carbon paper to make copies of his handwritten Complaint.  In these ways, he did not act with *reasonable diligence* in pursuing his rights.[71]

For each of these alternative reasons, I find that Plaintiff has failed to meet his burden of proof in demonstrating that the three-year statute of limitations should be equitably tolled based on the delay of copying services he experienced at the Green Haven C.F. Law Library during the

---

[70]     *Cf. Williams*, 2007 U.S. Dist. LEXIS 64856, at *3 (rejecting petitioner's equitable-tolling argument because "Petitioner has failed to show that the . . . photocopies [he] spent so much time and effort pursuing . . . were necessary to pursue his claims"), *adopting*, 2007 U.S. Dist. LEXIS 73785, at *15, n.7 ("Petitioner states that he used the thirty days allowed for submitting his appeal . . . to make [five] copies of his post-conviction pleadings and exhibits . . . .").

[71]     I also find that–to the extent that Plaintiff waited until the month before the July 12, 1998, filing deadline to make eight copies of his papers–he did not act with reasonable diligence in pursuing his rights.  *See Cook v. Stegall*, 296 F.3d 517, 521-22 (6th Cir. 2002) (where petitioner argued that the statute of limitations should have been tolled because a local rule of practice for the federal district court required habeas corpus petitions to be filed in duplicate and the prison photocopier was broken, finding that equitable tolling was inappropriate because petitioner could have made a copy of his petition years *before* the period during which the photocopier was broken); *cf. Ruiz*, 2000 U.S. Dist. LEXIS 13018, at *16-17 (criticizing plaintiff for waiting until last minute before trying to use copy machine in prison law library).

relevant time period.

ACCORDINGLY, it is

RECOMMENDED that the remainder of Plaintiff's claims in his Amended Complaint (Dkt. No. 38), i.e., his claims against Defendants Kenneth Collyer and Jane Parham arising from his wrongful placement in administrative segregation from May 5, 1995, to July 12, 1995, at Great Meadow C.F., be **DISMISSED** as barred by the applicable three-year statute of limitations.

Pursuant to 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b), Local Rule 72.1(c), and Fed. R. Civ. P. 6(a)(2), the parties have **TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS** (*see* Fed. R. Civ. P. 6[d]), from the date of this Report-Recommendation, within which to file objections to this Report-Recommendation.  Such objections, if any, shall be filed with the Clerk of the Court.  **FAILURE TO FILE TIMELY OBJECTIONS TO THIS REPORT-RECOMMENDATION WILL PRECLUDE LATER APPELLATE REVIEW OF ANY ORDER OF JUDGMENT THAT WILL BE ENTERED**.  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of H.H.S.*, 892 F.2d 15 [2d Cir. 1989]).

Dated: May 20, 2008
         Syracuse, New York

George H. Lowe
United States Magistrate Judge